*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
CRISFIELD, TANG[1], and GASTON,
Appellate Military Judges

————————————————

**UNITED STATES**
Appellee

**v.**

**Tammy L. TANG**
Lance Corporal (E-3), U.S. Marine Corps
Appellant

**No. 201800240**

Decided: 12 February 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary. Military Judge: Colonel Matthew J. Kent, USMC. Sentence adjudged 24 May 2018 by a general court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of a military judge sitting alone. Sentence approved by the convening authority: reduction to pay grade E-1, total forfeitures of pay and allowances, confinement for life without eligibility for parole, and a dishonorable discharge.[2]

For Appellant: Lieutenant Commander William L. Geraty, JAGC, USN.

For Appellee: Captain William J. Mossor, USMC.

————————————————

[1] Senior Judge Tang is unrelated to Appellant.

[2] The convening authority suspended all confinement in excess of 38 years in accordance with a pretrial agreement.

Chief Judge CRISFIELD delivered the opinion of the Court, in which Senior Judge TANG joined. Judge GASTON filed a separate opinion, concurring in part and dissenting in part.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

CRISFIELD, Chief Judge:

Appellant was convicted, in accordance with her pleas, of murder and aggravated assault in violation of Articles 118 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918 and 928 (2012).

Appellant raises one assignment of error: that her sentence to confinement for life without eligibility for parole is inappropriately severe. After careful consideration of the record of trial and the pleadings of the parties, we find no prejudicial error and affirm.

## I. BACKGROUND

Appellant was a 19-year-old first term Marine when she discovered she was pregnant. She was not married and had been dating the baby's father, himself a young Marine, for only four months. She immediately considered terminating the pregnancy through abortion. She knew she did not want to be a mother and that she did not want to derail her career and life to take care of a child. She searched the Internet for ways she could terminate the fetus, and she told others she considered drinking bleach and that when the baby kicked her, she hit him back.[3] She repeatedly referred to her baby as a "parasite" and resented that she could not deploy with her unit because she was pregnant. Nevertheless, she opted to carry the pregnancy to term because she feared the medical complications of abortion and because the baby's father and others convinced her to have the baby.

---

[3] When she was referred for mental health treatment regarding these alarming comments, Appellant insisted she was only joking.

Appellant moved into base housing with the baby's father in anticipation of the baby's arrival. Appellant gave birth to a healthy baby boy, D.I., on 4 September 2016. The arrival of D.I. did nothing to change Appellant's feelings toward motherhood. Although D.I.'s father encouraged her to have the baby, he was not interested in helping Appellant with the constant demands of parenting a newborn infant. Appellant also felt that D.I.'s father did not bear his share of the household costs. So, Appellant resented D.I. and her boyfriend for altering her life and draining her resources.

Due to Appellant's earlier concerning statements about her pregnancy, a gunnery sergeant in Appellant's chain of command went out of her way to visit Appellant at home several times each week. Appellant was on maternity leave, so her only contact with the chain of command was through these visits. This gunnery sergeant, herself a single mother, tried to give Appellant advice, which Appellant resented. Appellant's mother saw Appellant handling D.I. in a rough manner and told her to be gentler. Appellant resented this advice too. Other women tried to help and advise Appellant, which also frustrated her. These unwanted intrusions only further fed Appellant's resentment and loathing of D.I.

About one month after he was born, Appellant began deliberately and forcefully slamming D.I. onto the floor of his nursery, often headfirst.[4] She assaulted D.I. this way multiple times—as often as every other day for several weeks.[5] Appellant continued to abuse D.I. in this manner because it seemed to her like he could handle the abuse. A later autopsy revealed that these assaults caused significant internal injuries to D.I.—specifically, multiple fractured ribs and brain injuries that were in various stages of healing at the time of D.I.'s death.

On 30 October 2016, before he was two months old, Appellant was home alone with D.I. while the baby's father was out getting his hair cut. Around

---

[4] At trial, Appellant entered a plea of guilty by exceptions and substitutions, admitting that she intentionally dropped D.I. on the floor with a means likely to produce death or grievous bodily harm. Evidence admitted during pre-sentencing indicated that Appellant told Naval Criminal Investigative Service (NCIS) she forcefully slammed D.I. on the floor, pushing him away from her, toward the floor, while she was in a seated position.

[5] "I don't know the exact number, sir, but I know that it was more than once." Record at 182. Appellant had previously told NCIS special agents that she did this every other day for several weeks beginning when D.I. was about one month old.

2:00 p.m., Appellant, after thinking about her long list of resentments, forcefully threw D.I. headfirst onto the floor three times in rapid succession with the intent to kill him or inflict great bodily harm upon him. Appellant then picked D.I. up and apologized. She saw a golf-ball sized lump immediately appear on the side of his head. She used ice and then a warm compress to try to make the swelling go down. When the baby's father returned, she did not tell him what she had done. Then she gave D.I. a bath. From the time Appellant threw D.I. until the next morning, D.I. barely ate. Around 9:00 a.m. the next morning—about 18 hours after she threw him to the ground three times—Appellant took D.I. to the hospital, stating she was concerned that he would not eat. At the hospital she claimed she accidentally dropped D.I. on the floor one time, and she described how she attempted to treat him with ice, a warm compress, and a bath.[6]

D.I. was admitted, assessed, and transported by helicopter to a nearby civilian children's trauma center. He was intubated; two craniotomy holes were drilled into his skull to relieve the pressure on his brain; and he was injected with strong drugs to alleviate his pain. Doctors determined that he was having seizures. When they touched his feet to test his reflexes, he recoiled in pain. Scans of D.I.'s brain revealed that half of his brain was entirely dead; the other half had many dead portions. Even if D.I. would have ever regained consciousness, he would have only existed in a vegetative state, without any senses. Appellant and D.I's father agreed to remove D.I. from life support,[7] which was done on 6 November. It took 48 hours for D.I. to perish.

Appellant and D.I.'s father periodically visited D.I. in the intensive care unit during his eight-day stay. In the final hours of his violence-filled 57-day-long life, Appellant was indifferent to his suffering. When informed that he was dying she refused to hold him and told medical personnel not to wake her up to hold him until his heart rate was in the twenties.[8] Only when D.I.'s heart had slowed to her prescribed rate did Appellant hold D.I. for a period of time, but she would not continue to hold him until he perished. A nurse held him, then replaced him in his crib where he ceased breathing.

---

[6] She also stated he accidentally fell out of his swing once before when she had placed him in the swing upside down.

[7] Appellant later referred to this act as "pulling the plug" on her child. Pros. Ex. 17.

[8] Record at 243-44, 250-53; Pros. Ex. 5 at 7-8.

While the medical examiner took photos of D.I.'s corpse in his hospital room, Appellant and D.I.'s father were in the room, conversing and giggling. An autopsy revealed that D.I. had tremendous injuries, including multiple skull fractures, internal hemorrhaging, and broken ribs. After D.I.'s death, Appellant resumed her life. She moved back into the barracks. She knew she was under investigation. She maintained her claim that she accidentally dropped D.I. on 30 October and that he had taken one other accidental short fall prior to 30 October. She wanted the NCIS investigation to conclude so that she could move on with her life. After murdering D.I. and moving back into the barracks, she told her new roommate that the NCIS investigation was "fifty shades of bulls[***]t."[9] When asked what she meant by that, Appellant replied, "The world is overpopulated, and only the wealthy should be having kids."[10] NCIS special agents brought Appellant in for another interview in April, 2017, and confronted her with the autopsy results. After first maintaining her original story that she accidentally dropped D.I., she admitted that she abused D.I. She told the investigators she dropped him every other day for a period of several weeks in October and that on 30 October, she threw him three times.

Appellant negotiated a plea agreement in which the convening authority agreed to suspend any confinement in excess of 38 years. Pursuant to the agreement Appellant entered pleas of guilty and guilty by exceptions and substitutions to two offenses. During pre-sentencing, the Government presented testimony from D.I.'s treating physicians, nurses, the medical examiner, and other evidence.

In extenuation and mitigation, Appellant presented testimony from two psychiatrists who diagnosed her with a high functioning autistic spectrum disorder. This condition was not diagnosed until after Appellant was already charged with D.I.'s murder. According to the psychiatrists, this condition meant Appellant had difficulty regulating her emotions, controlling her impulses, and appreciating social nuances. Her condition contributed to her inability to empathize with D.I. These experts testified that the disorder did not prevent Appellant from appreciating the nature and wrongfulness of her conduct. She was of normal intelligence, and she could tell right from wrong, although she lacked emotional maturity. They opined that Appellant would not be a risk to society if released from the brig; in part, because she had

---

[9] Pros. Ex. 17.

[10] *Id.*

5

stated that she would not have any more children. In rebuttal, the Government played a recorded brig phone conversation between Appellant and D.I.'s father which took place after she had murdered D.I. In the conversation, Appellant stated that she wanted to have another child with him.

Additional facts necessary to resolution of the issues are contained in the discussion.

## II. DISCUSSION

Appellant argues that her sentence to life without eligibility for parole is inappropriately severe. We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment [she] deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988). This requires our "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (citation and internal quotation marks omitted). In making this assessment, we analyze the record as a whole. *Healy*, 26 M.J. at 395-97. Despite our significant discretion in determining sentence appropriateness, we may not engage in acts of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

We start with the fundamental brutality and repeated nature of Appellant's crimes. This was not a one-time loss of control in which Appellant snapped.[11] She said D.I. barely cried and was easily soothed when she attended to his needs. Appellant was D.I.'s sole caretaker during most of the hours of his life. He was completely helpless. She repeatedly and violently assaulted him by slamming or dropping him on the floor of his room. During the providence inquiry, she stated this happened at least twice. These assaults actually inflicted serious injuries on D.I., which were noted during his autopsy. Rather than being horrified by her offenses, she thought that because D.I. survived her initial assaults ("sustained the damage") she could continue.[12] Then she murdered him by throwing him headfirst into the ground three times with the intent to kill him or inflict bodily harm. He died

---

[11] Such an act would still warrant severe punishment; a repeated pattern of deliberate violence likewise warrants appropriately severe punishment.

[12] Pros. Ex. 12; Pros. Ex. 23.

eight days later from the massive brain injuries resulting from Appellant's actions. These major crimes call for appropriately severe punishment.

The Government presented substantial aggravating evidence related to Appellant's offenses. Her actions after she inflicted the injuries that would cause the death of her son reflected a chilling callousness to his suffering. Most importantly, she waited overnight, nearly 18 hours, to seek medical attention for D.I. After throwing him onto the ground the third time, Appellant noticed a "golf ball size" swelling on the right side of his head, labored breathing, "carpet burn" on his face, and "a very muffled whine."[13] "I was horrified about what I did. I was so shocked that I was capable of doing something so horrific."[14] In spite of this instant realization, Appellant waited until the following morning to take D.I. to the hospital. Then she provided false information to D.I.'s doctors who sought to treat him.

The testimony of witnesses and the evidence presented universally demonstrate that Appellant was shockingly indifferent to D.I.'s suffering as he lay dying in the hospital. She refused almost every opportunity to hold him and slept through most of his final hours. She stated that she was relieved that he died and she could go back to her normal life. As she stood over the baby in the hospital, she thought to herself, "My prayers and wishes were answered in the worst way."[15] Although generally emotionless throughout these events, she became visibly upset when the mother of D.I.'s father took her to a pizza restaurant for dinner rather than the restaurant she wanted to go to. She refused to participate in any "memory making"[16] activities in the baby's final hours. When the medical examiner came into the room to declare D.I. dead, Appellant and D.I's father were giggling and cracking jokes. This behavior can be fairly considered aggravating. *See United States v. Gogas*, 58 M.J. 96, 99 (C.A.A.F. 2003).

Appellant argues that her diagnosis of autistic spectrum disorder mitigates her offenses and renders life without eligibility for parole an inappropriately severe sentence. We believe that the disorder helps explain some of Appellant's noted social awkwardness and inappropriate comments, but it does nothing to explain or mitigate her multiple acts of brutality toward her

---

[13] Record at 174-75.

[14] Record at 169.

[15] Pros. Ex. 20, p. 7.

[16] Such as taking impressions of D.I.'s feet and hands.

own child, her substantial delay in seeking medical attention for him, or her self-centered indifference to his suffering. Telling the intensive care unit nurse that she did not want to hold D.I. and did not want to be woken up until his heartbeat reached 20 beats per minute was not social awkwardness or failure to appreciate social nuances—it was cold heartedness.[17]

In short, Appellant never wanted to be a mother. She believed that D.I. would change her life for the worse. He cost her time, money, her ability to deploy, and she resented him for it. When people tried to help her, she pushed them away and resented the fact that they dared tell her how to be a mother. Because of all of her resentments, she abused D.I. and threw him to the ground repeatedly with the intent to kill him or inflict great bodily harm. When she killed him, she was relieved and sought to resume her life as it was before she became pregnant. Her wish had come true.

Appellant argues that her condition made it difficult for her to express remorse, and that she actually felt remorse for what she did. Even considering that Appellant's mental disorder may limit her ability to communicate, we do not find substantial evidence that Appellant feels genuine remorse or any sadness at all at having taken D.I.'s life. Her lack of remorse is combined with a lack of understanding of the immensity of her criminal acts. While in pre-trial confinement pending trial for D.I.'s death, she told D.I.'s father that she would like to have *another* child with him.

Having given individualized consideration to the nature and seriousness of these crimes, the Appellant's record of service, and all matters contained in the record of trial, including matters submitted by the Appellant in extenuation and mitigation, we conclude the sentence as approved by the convening authority is not inappropriately severe and is appropriate for Appellant and her offenses. *United States v. Baier*, 60 M.J. 382, 384-85 (C.A.A.F. 2005); *Healy*, 26 M.J. at 395-96; *Snelling*, 14 M.J. at 268. Granting sentence relief at this point would be to engage in clemency, which we decline to do. *Healy*, 26 M.J. at 395-96.

---

[17] The ICU nurse testified: "So I had asked her if she wanted to hold D.I. since his heart rate was slowly going down. And she said she wanted to keep sleeping. So I went ahead and I picked him up, because I felt like I didn't want him to die alone without being held by somebody." Record at 252.

## III. Conclusion

After careful consideration of the record and briefs of appellate counsel, we have determined that the approved findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred. Arts. 59, 66, UCMJ. Accordingly, the findings and sentence as approved by the convening authority are **AFFIRMED**.

Senior Judge TANG concurs.

GASTON, Judge (concurring in part and dissenting in part):

I concur in the majority's affirmance of reduction to E-1, total forfeitures of pay and allowances, and a dishonorable discharge; however, I believe a sentence of confinement for life without the possibility of parole is inappropriately severe given the facts of this case. Our charge under Article 66 is to "affirm only such findings of guilty and the sentence or such part of amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66, Uniform Code of Military Justice, 10 U.S.C. § 866(d)(1) (2019). This power has been described as "a sweeping congressional mandate to ensure a fair and just punishment for every accused." *United States v. Baier*, 60 M.J. 382, 384 (C.A.A.F. 2005) (internal quotation marks and citation omitted). The aim is to arrive at a sentence no more severe than that "warranted by the offense, the circumstances surrounding the offense, [the Accused's] acceptance or lack of acceptance of responsibility for [her] offense, and [her] prior record." *United States v. Aurich*, 31 M.J. 95, 97 n.* (C.M.A. 1990). While I share my colleagues' view that Appellant's actions were among the most egregious, callous acts imaginable, I nevertheless do not believe the adjudged sentence of confinement without the possibility of parole adequately takes into consideration the significant evidence in extenuation and mitigation present in this case, nor Appellant's acceptance of responsibility in pleading guilty to the offenses.

By any reading of the record before us, Appellant's then-undiagnosed Autism Spectrum Disorder (ASD), formerly known as Asperger's Disorder, significantly impacted her coping and decision-making abilities under the stress and strain of taking care of an infant for the first time. As the board-certified O-6 Head of Forensic Psychiatry Services at Naval Medical Center San Diego testified, the R.C.M. 706 board that he served on for Appellant "thought long and hard" before it was even able to conclude Appellant was able to appreciate the nature and quality of the wrongfulness of her conduct, given "her lack of social intelligence, her lack of social acumen, [and] her lack of emotional intelligence."[18] He described ASD as "among the greatest of mental defects that we work with" and testified that due to her condition Appellant "really was baffled by even basic emotional experiences and functioned along those lines, much more like a preadolescent, prepubescent

---

[18] Record at 276-77.

child with regard to emotional intelligence, emotional understanding."[19] He testified that Appellant's ASD, though "mild," was still severe enough to prevent her from having a "normal adult appreciation for her behavior and conduct" and would have barred her enlistment in the Marine Corps had it been properly diagnosed at that time.[20]

Appellant's videotaped unsworn statement and interrogation by NCIS confirm the thrust of this seasoned psychiatrist's testimony. Appellant has a strangely flat, overly formal affect and demeanor that do not comport with normal social situations. Her speech is eccentric-sounding, and she has always felt there is a wall between herself and other people. She expresses herself best through cartoon drawings. She grew up in a single-parent household largely devoid of emotional content or expression. She met D.I.'s father—her first real boyfriend—through a shared interest in video games, comics books, and anime, and they named D.I. after a video game character. That such an individual would have or at least would be perceived as having inappropriate emotional responses under trying or tragic circumstances is simply beyond question.

Predictably, this intensely socially awkward young woman soon began to feel overwhelmed as a pregnant, unwed, 19-year-old Marine, burdened with a condition that made it difficult for her to adapt to emotional changes and particularly ill-equipped at handling stress. The stressors of her pregnancy alone led her to start cutting herself. And once D.I. was born, when his crying could not be ameliorated through Appellant's structured breast-feeding regimen, the logic of the situation broke down and she started losing control of herself. She would throw the baby down, feel horrified about what she had done, then pick him back up and hold him in her arms and apologize. While she maintained she was not trying to kill him, she repeated these violent actions toward D.I., knowing what she was doing was wrong, and ultimately causing his death. Horrific though it is, as her R.C.M. 706 board discussed, this pattern of immature, childlike behavior is more illustrative of a person intently focused on immediate alleviation of acute emotional discomfort than someone giving any real consideration to the consequences.

While frustration with caring for a newborn by no means excuses Appellant's actions, and she had a plethora of other options available to seek help

---

[19] Record at 274, 276.

[20] Record at 277, 280.

in addressing the issue, yet pursued none of them, I nevertheless find the surrounding facts and circumstances both extenuating and mitigating. They reveal her actions to be not so much those of a heartless killer, but rather the contorted, desperate acts of young woman with a serious mental disorder trying to cope with stressors she found overwhelming. However tragic and inexcusable their result, these circumstances in my mind do not justify awarding the maximum possible punishment, particularly for an accused who voluntarily accepted responsibility for her actions and pleaded guilty to her offenses. Generally speaking, "[a] life without parole sentence 'means a denial of hope, it means that good behavior and character improvement are immaterial, it means that whatever might be in store for the mind and spirit of the convict, [s]he will remain in prison for the rest of [her] days.'" *Campbell v. Ohio*, 138 S. Ct. 1059, 1059-60 (2018) (Sotomayor, J., concurring in denial of certiorari) (quoting *Graham v. Florida*, 560 U.S. 48, 70 (2010)). While one may well imagine facts and circumstances under which such a sentence would be appropriate, I do not believe they are present here.

Accordingly, I would affirm only so much of the sentence of confinement as extends to confinement for 45 years, which I believe fulfills our "judicial function of assuring that justice is done and that the accused gets the punishment [she] deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988).

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court